GEORGE FILLER AND EVELYN FILLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Filler v. Commissioner
Docket Nos. 37937-85; 37943-85; 319-86; 320-86; 6417-86; 6420-86.
United States Tax Court
T.C. Memo 1987-468; 1987 Tax Ct. Memo LEXIS 464; 54 T.C.M. (CCH) 557; T.C.M. (RIA) 87468; September 17, 1987. *464 Fs and S owned land as tenants in common. Fs were the sole shareholders of a corporation and sole trustees and beneficiaries of its pension trust. S was the sole shareholder of another corporation and sole trustee and beneficiary of its pension trust. Each co-owner of the land simultaneously granted to the other co-owner's pension trust an option to buy an undivided one-half interest in the land on identical terms. Thereafter, the options were exercised and the land was immediately sold to a third party. Held: On consideration of all the facts, the substance of the transaction as a whole was a sale by Fs and S to the third party. Held: The additions to tax under sec. 6653(a)(1) and ( 2), I.R.C. 1954, are not applicable. Darrell D. Hallett, for the petitioners. Larry N. Johnson, for the respondent FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' income and excise taxes: Taxable Period
Docket No.
Petitioners
(and Tax)
Amount
37937-85
George and Evelyn Filler
1981
$ 445,922
(income tax)
37943-85
Miles S. and Beth A. Schlosberg
1981
$ 283,080
(income tax)
319-86
Robino, Inc. Pension Trust
6/30/82
$ 198,437
(income tax)
320-86
Auke Bay Fish and Fruit Company
7/31/82
$ 198,437
Pension Trust
(income tax)
6417-86
Miles and Beth Schlosberg
1981
$ 32,894
(excise tax)
6420-86
George Filler
1981
$ 32,894
(exercise tax)
*467 The following issues are presented for decision: [2]
1. Whether petitioners Miles S. and Beth A. Schlosberg and George and Evelyn Filler realized gain on the sale of undivided interests in real property to their respective pension trusts as reported on their income tax returns, or whether the purported sales to the pension trusts should be disregarded for tax purposes and petitioners' gain from the disposition of the property determined by reference to the price for the property paid by a third party. 2. Whether petitioners George and Evelyn Filler and Miles and Beth Schlosberg, are liable for the additions to tax provided by section 6653(a)(1) and (2)[3] for negligence or intentional disregard of the rules and regulations. 3. In the alternative, whether the gain on the sale of the real property constituted unrelated business income of the pension trust subject to tax under section 511. 4. *468 In the alternative, whether petitioners' sales of their interests in the real property to the pension trusts constituted prohibited transactions subject to the excise tax provided by section 4975. FINDINGS OF FACT 1. General
Petitioners George and Evelyn Filler (the Fillers), husband and wife, were legal residents of Bainbridge Island, Washington, when they filed their petition. They owned equally all of the stock of Robino, Inc., a Washington corporation formed April 1, 1981; he was vice-president and she was president. The Fillers are the sole trustees and beneficiaries of Robino, Inc. Pension Trust (Robino Trust), headquartered in Seattle, Washington; the Robino pension plan was established July 1, 1981, and determined by respondent on July 19, 1982, to be a qualified pension plan under section 401. Petitioner Miles S. and Beth A. Schlosberg, husband and wife (the Schlosbergs), were legal residents of Anchorage, Alaska, when they filed their petition. Auke Bay Fish and Fruit Company (hereinafter Auke Bay) was formed August 14, 1979, and Miles Schlosberg (Schlosberg) owned all of its outstanding stock. Schlosberg was the sole trustee and beneficiary of the Auke *469 Bay Fish and Fruit Company Money Purchase Pension Plan (Auke Bay Trust), established on or about August 14, 1979. Auke Bay Trust was headquartered in Anchorage, Alaska, and was determined by respondent on or about May 18, 1981, to be a qualified pension plan under section 401. This determination was not changed or revoked prior to the termination of the plan on or about September 1, 1983. George Filler (Filler), an architect, moved to Alaska, in 1956 and worked for 3 years in Juneau and Anchorage for the United States Department of the Interior and then, when Alaska became a State, as State Architect for the Alaska Department of Public Works. In 1968, he entered the private practice of architecture. Beginning in 1973, he engaged in various real estate developments, including the design, construction and operation of apartments and condominiums in Seattle, Washington. From 1979 to 1981, Filler did not engage in the architectural or real estate development businesses but devoted his time to the management of his business interests and investments in the Juneau, Anchorage, and Seattle areas. Miles Schlosberg graduated in 1972 from Stanford University with J.D. and M.B.A. degrees. *470 From 1972 through 1975, he practiced law in Anchorage and then moved to Juneau where he headed a division in the Alaska Department of Commerce for about one year. He then returned to Anchorage to practice law for about 3 years, and in December 1978 he abandoned the practice of law and moved to Juneau where he engaged in a number of real estate ventures. 2. Purchase of the Wometco Property
In 1980 and for several years previously, there was much uncertainty about the future growth and development of Juneau due to a controversy over the location of the Alaska State capital. In 1974, an initiative was adopted to move the capital to a location between Anchorage and Fairbanks. In 1978, two votes on the issues were taken. In the first, the voters approved by a 55.7-percent margin an initiative to cover "all bondable costs" for the move. In the second initiative, the voters defeated by a 73.5-percent margin a proposal for a $ 966,000,000 bond issue to cover the costs of the move. Finally, in 1981, the State legislature scheduled for November 1982 a "winner take all" proposal calling for approval by the voters of all bondable costs for the move or, if defeated, repeal of all *471 previous initiatives on the move. The proposal to move the capital was a volatile factor for commercial real estate development in Juneau during this period. Although commercial real estate was being purchased and sold, a great deal of uncertainty existed with respect to the potential development of office buildings, particularly those buildings that would be occupied by State offices. On December 5, 1980, Filler and Schlosberg entered into an agreement with Wometco Lathrop Company (Wometco) to purchase an old movie theatre building situated on a 4-acre parcel of land in downtown Juneau for a total price of $ 1,450,000, payable with $ 300,000 in cash at closing and $ 1,150,000 covered by a note and deed of trust payable within 12 years with interest. For several years, the property had been listed with the Alaska Coastal Real Estate firm (ACRE) at a price of $ 1,850,000. Schlosberg had previously explored rental possibilities, including an inquiry in September or October 1980 whether the State of Alaska would be interested in renting approximately 32,000 square feet if the theatre building were converted into an office building. In response to Schlosberg's inquiry, a memorandum *472 was sent to the several agencies, and the Department of Fish and Game, which was about to be evicted from its then existing facility, responded affirmatively. On December 10, 1980, the Alaska Department of Administration issued a letter of intent to Filler and Schlosberg regarding a lease of a minimum of 32,000 square feet in the office building for occupancy by the Department of Fish and Game. On February 11, 1981, Filler and Schlosberg, as lessors, and the State of Alaska, as lessee, entered into an agreement to lease the theatre property for 5 years and 7 months. Filler and Schlosberg were to renovate the building to meet the specifications of the Department of Fish and Game. To enable Filler and Schlosberg to obtain the needed financing for the renovation costs, Wometco was required to agree that its deed of trust would not cover the portion of the property, referred to as Lot B, on which the theatre building was situated. The encumbered remainder of the property, referred to as the "surplus" property, included a total of approximately 116,880 square feet but of this square footage 27,553 square feet was an unusable "split." This left 89,327 usable square feet. This arrangement *473 required an allocation of the $ 1,450,000 purchase price between Lot B and the surplus property because cash was to be paid for Lot B and the surplus property was to be financed. On or about March 24, 1981, the purchase of the Wometco property was completed. The agreed price for Lot B was $ 1,000,000 paid in cash, [4] and the price for the surplus property was $ 450,000, paid by a note secured by a deed of trust, covering the surplus property, on which Filler and Schlosberg were personally liable. Title and ownership of Lot B was placed in Robino, Inc. and Auke Bay by deed dated March 24, 1981. Title to and ownership of the surplus property was placed in Filler and Schlosberg as tenants in common. 3. Department of Labor Office Space Needs
For a number of years prior to 1981, the State Department of Labor (DOL) *474 occupied offices in several buildings in the Juneau area. In August 1980, or thereabouts, the Alaska State Government solicited bids for the lease of office space to be occupied by DOL. Charles Blomfield (Blomfield), a well-known real estate developer located in Anchorage, was the lowest bidder but the State rejected all the bids that were received. In the spring of 1981, DOL learned that its leased space in the Sealaska Building would not be renewed. Goldbelt, Inc. (formerly Tlingit-Haida Regional Housing Authority), one of the Alaska native corporations, in early 1981 attempted to negotiate an office space lease with the State on a sole-source basis without competitive bidding. Richard Holden, one of Blomfield's partners, objected to the sole-source arrangement and insisted that a lease should be awarded only after competitive bidding. He succeeded in April or early May in persuading the State authorities to agree not to obtain the space under sole-source procedures. Based on these developments, Blomfield anticipated that the State would solicit bids for DOL space and promptly began preparations to submit a bid. In May or early June 1981, Bennett Williams (Williams), a *475 real estate broker in Anchorage who represented Blomfield, contracted Henry Tiffany (Tiffany), a commercial real estate agent working with ACRE. Williams informed Tiffany that Blomfield anticipated that the DOL would soon announce an initiative to bid for office space in Juneau and requested Tiffany to locate suitable land on which to construct an office building if Blomfield were successful in obtaining the DOL lease. Shortly after his discussions with Williams, and not later than the last week of June 1981, Tiffany contacted Schlosberg regarding an option to purchase the surplus property, explaining that Blomfield was planning to bid for the DOL lease if bids should be invited. The surplus property was well suited for the construction site of the type of building which it was anticipated DOL would want. Schlosberg conferred with Filler and Tiffany on several occasions during June and July 1981 on the prospects of selling the surplus property. 4. The Cross-Options Agreement
On June 3, 1981, Schlosberg discussed with James Conahan (Conahan), a Honolulu, Hawaii, lawyer, who specialized in profit-sharing matters, the possibility of having Auke Bay Trust, ruled by the IRS *476 to be tax exempt on May 18, 1981, acquire an interest in the surplus property. After exploring other possibilities, Conahan suggested that Auke Bay Trust obtain an option to buy Filler's one-half interest in the property and that Robino Trust, not yet finally established, obtain an option to buy Schlosberg's one-half interest. After talking with Conahan, Schlosberg contacted Filler to ascertain his views on Conahan's proposal. Both Filler and Schlosberg were aware of the tax advantages of the proposal accorded by tax exemption of the trusts. By the second week of June 1981, Filler and Schlosberg reached an agreement concerning the terms of the options for Auke Bay Trust and the then-to-be-created Robino Trust to purchase one-half interests in the property. The options were typed and the terms were agreed upon by Filler and Schlosberg by June 23, 1981. The options were mailed to Filler on Bainbridge Island, near Seattle. On or about July 1, 1981, as noted above, Robino, Inc., established Robino Trust. After consulting his attorney, Filler and his wife executed his option to Auke Bay Trust on July 13, 1981; on that day, he wrote a check on Robino Trust's account for $ 5,000 *477 payable to Schlosberg as consideration for the option. Schlosberg executed his option to Robino Trust on July 13, 1981, and wrote a check on the Auke Bay Trust account for $ 5,000 payable to Filler as consideration for the option. The cross-options contained the following terms and conditions: 1. The pension trusts were each to pay $ 5,000 for the options which, if accepted, would be applied to the purchase price. 2. Each option, for a period of 2 years, was exclusive. 3. If exercised, the purchase price of each undivided one-half interest was $ 275,000 payable by assumption of one-half of the outstanding balance on the Wometco deed of trust and the balance of the purchase price payable in cash or promissory notes secured by first deeds of trust on other real property having a value twice the amount due, payable in 3 years, and bearing interest of 10 percent. 5. The Option to ACRE
Under date of July 13, 1981, following discussions with Schlosberg, Tiffany hand delivered a cover letter to him transmitting the following proposed option for ACRE or its assignees to purchase the surplus property and petitioners signed it: OPTION TO PURCHASE In consideration *478 of One dollar, receipt of which is hereby acknowledged, the undersigned owner grants to Alaska Coastal Real Estate, Incorporated (ACRE) or its assignees the option to purchase for Seventeen Dollars per square foot the following property: Those areas labeled section I, II A and B and section III of the Taku Twins Theater site. In the event buyer selects only section 1 and 2, the price per square foot shall be Sixteen Dollars per square foot. Payment: Cash. Square footage to be determined by a registered surveyor. This option shall extend from July 10 through October 10, 1981. This option is nonexclusive so long as said property is available for purchase to ACRE or its assignees should they be successful in their bid for the Department of Labor office space contract should such be put out to bid during this time. July 18, 1981
Date /s/ Henry Tiffany
Henry Tiffany /s/ George Filler
Owner /s/ Miles Schlosberg
Miles Schlosberg It is assumed that in signing this it has the concurrence of your partner, Mr. George Filler. In drafting the option, Tiffany used the July 10, 1981, date for the beginning of the option period because he anticipated, *479 based on his prior discussions with Schlosberg, that the option would be signed on that date. The October 10, 1981, expiration date was used because the parties anticipated an invitation to bid on the DOL office space would be made in August and such invitations usually lasted 30 days. On July 18, 1981, Schlosberg and Filler as individuals and Tiffany on behalf of ACRE executed the above-quoted option as presented by Tiffany except that Schlosberg and Filler crossed out the financing terms as originally drafted and substituted the word "cash." 6. The Options and Sale to Blomfield
On August 20, 1981, the State of Alaska Division of General Services announced an invitation to bid for the lease of approximately 55,000 square feet of office space to be located in the general vicinity of downtown Juneau beginning on July 1, 1982. The office space was to be occupied by DOL. Blomfield wished to submit a bid for the lease and to support his bid he needed an option on land suitable for the construction of a building for lease to the State. On September 15, 1981, after 2 days of negotiations, Filler and Schlosberg, as trustees of Robino Trust and Auke Bay Trust, respectively, *480 executed two identical options to Blomfield each for the purchase of an undivided one-half interest in a portion of the surplus property. Each option contained the following terms and conditions: (a) Each option stated it was granted on September 14, 1981, but was signed and dated September 15, 1981. (b) Each option was for the purchase of an undivided one-half interest in 82,263 square feet of the surplus property. (c) Each option might be exercised only if Blomfield was the successful bidder of the DOL lease. (d) Each option could be exercised on or before December 1, 1981. (e) The purchase price for each undivided one-half interest in the covered surplus property was $ 8 per square foot, or a total price of $ 657,888. (f) The purchase price of each undivided one-half interest in the covered surplus property would be paid by a down payment of $ 150,000 due on or before December 1, 1981, assumption of one-half the balance due on an existing deed of trust on the property, and the balance paid in cash before August 1, 1982. (g) Blomfield agreed to exercise each option if he was awarded the DOL lease contract and was able to obtain financing from or through AIDA. *481 On September 17, 1981, the Blomfield Company submitted its bid for DOL lease. The bid included as part of the submission copies of the options on the surplus property obtained from Auke Bay Trust and Robino Trust. At least two other bids were submitted for the lease. On September 17, 1981, the bids were opened. The Blomfield Company was the lowest bidder and was awarded the DOL lease of office space. On October 10, 1981, Blomfield notified Schlosberg and Filler in writing of his intent to exercise the September 15, 1981, options. On October 30, 1981, Robino Trust and Auke Bay Trust exercised their respective July 13, 1981, options. The $ 275,000 purchase price was paid by each trust's assumption of one-half of the balance due on the Wometco note and deed of trust, application of the $ 5,000 that each trust paid for the options, and payment of $ 45,000 to each seller. On October 30, 1981, Filler conveyed a one-half interest in the surplus property to Auke Bay Trust and Schlosberg conveyed his undivided one-half interest therein to Robino Trust. On October 31, 1981, Robino Trust and Auke Bay Trust each conveyed an undivided one-half interest in the property to the individuals *482 comprising the Blomfield group. The sale price for each undivided one-half interest was $ 657,888 or $ 1,315,776 for the portion of the surplus property sold. The consideration for each conveyance was an follows: (a) A down payment of $ 150,000 to each pension trust; (b) Assumption of one-half of the balance due on the Wometco deed of trust on the entire surplus property; and (c) Execution of a deed of trust note to each pension trust in the amount of $ 284,741.73 due in full in August 1982, bearing interest at the rate of 15 percent per annum and secured by a deed of trust on each undivided one-half interest in the surplus property. Blomfield paid Williams a commission, in which Tiffany shared, for locating the surplus property for use in submitting the DOL lease bid. 7. The Income Tax Returns
On their income tax returns for 1981, the Fillers reported gain on the sale of their one-half interest in the surplus property, computed by using a cost basis of $ 225,000 (adjusted $ 1,000 for depreciation) and a sale price of $ 275,000, and a short-term gain of $ 51,000. The return was prepared by Gerry Keppler, a certified public accountant, who reviewed the transactions *483 involving the options and sales of the surplus property and advised that there was a reasonable basis for reporting the transactions in that manner. The Fillers relied upon the advice of the accountant in this regard. In the notice of deficiency respondent determined that the sales price realized for the surplus property was $ 657,888 and that only $ 200,000 of the Fillers' $ 225,000 basis in the surplus property was allocable to the portion sold to Blomfield. On this ground, respondent determined that Filler and his wife had a short-term gain of $ 457,888 from the sale. Respondent also determined that petitioners are liable for an addition to tax under section 6653(a)(1) and (2). On their income tax returns for 1981, the Schlosbergs reported a sales price of $ 275,000, a basis of $ 225,000, and a short-term gain of $ 50,000 from the sale of one-half of the property purchased by Blomfield. Their return was prepared by Ronald Griesen, a certified public accountant, who reviewed the options and sales of the surplus property and advised that there was a reasonable basis for so reporting the transactions on their 1981 return. The Schlosbergs relied upon the advice of the accountant *484 in this respect. In the notice of deficiency, respondent determined that the sales price of Schlosberg's interest in the surplus property was $ 657,888, that the basis in the portion sold to Blomfield was $ 200,000 and that the short-term gain from the transaction was $ 457,888. Respondent also determined that the Schlosbergs are liable for additions to tax under section 6653(a)(1) and (2). [5]
OPINION Petitioners contend that Robino Trust and Auke Bay Trust each exercised its July 13, 1981, option to purchase an undivided one-half interest in the "surplus" property for $ 275,000 and then, pursuant to the September 15, 1981, option to Blomfield, each of the trusts sold its interest in the property to Blomfield for $ 657,888. On this ground, petitioners contend that their respective short-term capital gains on the transaction are measured by the difference between their bases for the property and the $ 275,000 they each received from the trusts. Respondent, on the other hand, recognizes *485 that, in form, petitioners sold their respective interests in the surplus property to the trusts and the trusts made the sales to Blomfield. However, he argues that form is not controlling and that the substance of the transaction was a sale by petitioners to Blomfield with the trusts serving as conduits through which title passed from petitioners. On this ground, respondent contends that petitioners realized gain measured by the difference between their respective bases for the property and the $ 657,888 paid by Blomfield for each undivided one-half interest. In weighing the merits of these arguments, the formal relationships between the several parties to the cross-option and sales transaction must be borne in mind. The Fillers, on the one hand, and Schlosberg, on the other hand, had identical one-half interests as tenants in common in the surplus property. The Fillers were the sole shareholders of Robino Inc. and the sole trustees and beneficiaries of Robino Trust to which Schlosberg optioned his undivided one-half interest in the surplus property. Similarly, Schlosberg was the sole shareholder of Auke Bay and the sole trustee and beneficiary of Auke Bay Trust to which the *486 Fillers optioned their undivided one-half interest in the property. [6] The two trusts, in form, later simultaneously sold their interests in the surplus property to Blomfield, an unrelated third party. *487 One of the most fundamental tenets of the Federal income tax laws is that, although a taxpayer may structure his business transactions in such way as to incur the minimum amount of income tax, or to avoid it altogether, the tax effect of a transaction will be governed by substance rather than form unless the controlling statute otherwise directs. Gregory v. Helvering,293 U.S. 465 (1935). The tax consequences of a transaction are not determined merely by the refinements of title but by the "actual command over the property taxed." Corliss v. Bowers,281 U.S. 376, 378 (1930). "Command" may be exercised "through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." Griffiths v. Helvering,308 U.S. 355, 358 (1939). Special scrutiny will be given to a transaction involving related persons or agencies to prevent the deflection of the incidence of taxation from the one who actually receives the benefits of the transaction. Commissioner v. Sunnen,333 U.S. 591, 605 (1948). Two landmark *488 Supreme Court decisions reaching opposite results provide some guidance for applying these basic legal principles. In Commissioner v. Court Holding Co.,324 U.S. 331 (1945), an apartment house, which was the sole asset of the taxpayer corporation, was transferred as a liquidating dividend to the corporation's two shareholders. They in turn formally conveyed it to a purchaser who had negotiated an oral agreement for the purchase from the corporation before the apartment was transferred to the shareholders. The Tax Court found that the facts relating to the whole transaction showed that the sale was made by the corporation and not to the two shareholders. The Supreme Court, looking to the substance of the transaction as a whole, held that the Tax Court was justified in attributing the gain from the sale to the corporation. The Supreme Court explained (at 334): A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. * * *
Stated another way in Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938), *489 the principle is: A given result at the end of a straight path is not made a different result because reached by following a devious path. In United States v. Cumberland Pub. Serv. Co.,338 U.S. 451 (1950), the taxpayer-corporation transferred property to its shareholders as a liquidating dividend in kind. The shareholders then transferred the property to a purchaser. The Court of Claims found that, although the method followed by the corporation to dispose of its assets was chosen in order to reduce taxes, the liquidation and dissolution genuinely ended the corporation's activities and existence and that at no time did the corporation plan to make the sale itself. Accordingly, the Court of Claims found that the sale was made by the shareholders and the corporation did not realize gain on the sale. The Supreme Court affirmed, distinguishing Commissioner v. Court Holding Co., supra, on the differences in the trial courts' findings of fact in the two cases. The Court rejected the Government's emphasis on the taxpayer-corporation's tax savings motives, stating (at 455): Whatever the motive and however relevant it may be in determining whether *490 the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes. The Court added that it is "for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." United States v. Cumberland Pub. Serv. Co., supra at 456. The principles of Commissioner v. Court Holding Co., supra, and United States v. Cumberland Pub. Serv. Co., supra, have been extended beyond corporation liquidations to a wide variety of factual situations. Accordingly, our task is to determine who in substance, and not simply in form, sold the surplus property to Blomfield. See, e.g., Hallowell v. Commissioner,56 T.C. 600, 606-607 (1971); Malkan v. Commissioner,54 T.C. 1305, 1313 (1970), and cases cited. [7]
*491 Petitioners' case was presented and briefed with great skill. We are compelled to hold, however, that, in substance, petitioners sold the surplus property to Blomfield and used the trusts as conduits of title. We reach this conclusion because, in our opinion, the prearranged July 13, 1981, cross-options to the trusts were indirect transactions between petitioners and their respective trusts and did not materially alter petitioners' economic relationship to the property. The record is clear that the Fillers and Schlosberg were looking for an opportunity to re-sell the surplus property at a profit from the outset of their ownership. In the spring of 1981, several developments, described in our findings, occurred which indicated there was a strong probability the property could be profitably sold. Most important was the prospect that DOL would invite bids for a lease of a substantial office building. Although DOL had not announced its intention to do so, Blomfield in May or early June 1981, through a representative, engaged Tiffany to locate property which could be used in submitting a bid for the DOL lease. Petitioners' surplus property was one of the most suitable pieces of *492 property in Juneau for this purpose. The cross-option device which, in effective, would shelter a part of their gain on a sale, was recommended by Conahan, a lawyer who had represented Schlosberg in connection with his Auke Bay Trust, which was ruled by the IRS on May 18, 1981, to be qualified under section 401. When Conahan made the cross-options recommendation in early June 1981, the Fillers had not even created Robino Trust and did not complete its organization until July 1, 1981, about the time the Fillers received from Schlosberg the option agreement they were to sign giving Auke Bay Trust an option on their undivided one-half interest in the property. Also, by that date, Tiffany had already talked with Schlosberg about Blomfield's interest in having all or part of the surplus property available for use in submitting a bid on the DOL lease. At Conahan's suggestion, Schlosberg, in effect, proposed to the Fillers that he would cause Auke Bay Trust to pay them $ 5,000 for an option on their undivided interest in the surplus property provided the Fillers would cause Robino Trust to pay Schlosberg $ 5,000 for an option on his one-half interest. To carry out this plan, Schlosberg *493 already controlled Auke Bay Trust; the Fillers still had to complete the creation of Robino Trust but its organization was under way. The Fillers and Schlosberg acted in concert in executing these identical option agreements and in every subsequent step in completing the sale to Blomfield. The unmistakable inference from the arrangement is that neither option would have been given without the other. Each option called for the trust-optionee to pay the owner-optioner $ 5,000 as consideration for the option, and each option called for a $ 275,000 purchase price. Eachoption covered an undivided one-half interest in the surplus property so that whatever rights were acquired by each trust were the same as they would have been if the parties had directly given options to the trusts of which they were respectively trustees and beneficiaries. Thus, neither in terms of objective economic realities nor in terms of legal rights conveyed did either trust receive any interest or rights in the surplus property different from what it would have received if the Fillers had granted their option to Robino Trust which they controlled and Schlosberg had given his option to Auke Bay Trust which he *494 controlled. Similarly, the cross-option arrangement did not materially alter the objective economic or legal position of petitioners as co-owners of the surplus property compared with what their respective positions would have been if they had given the options to their own trusts. Petitioners each still owned undivided one-half interests in the surplus property as tenants in common subject to the options. True, each co-owner as trustee could be compelled through exercise of the option to sell his one-half interest to the other co-owner's trust. But the selling co-owner could simultaneously compel the other co-owner to sell his interest to the selling co-owner's trust on precisely the same terms. There is nothing in the record even to suggest that the relationships between the Fillers and Schlosberg were anything but harmonious from the date of their purchase of the surplus property through the signing of the prearranged options to the final sale to Blomfield. Petitioners' relationship and control over the property thus was, in substance, no different from what it would have been if petitioners had granted the options to their own controlled trusts. These facts demonstrate *495 that the cross-options arrangement of July 13, 1981, "does not stand on the solid foundation of economic reality." Markosian v. Commissioner,73 T.C. 1235, 1241 (1980). It is true, as petitioners emphasize, that valid options are enforceable contracts. See, e.g., 1A, A. Corbin, Contracts, sec. 259, pp. 459-460 (1963 & 1971 Supp.). By giving the identical cross-options covering identical interests to each other's controlled trust, however, petitioners did not materially change any cognizable relationship they had to the surplus property. See Zmuda v. Commissioner,731 F.2d 1417, 1420-1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982). The Fillers and the Schlosbergs, continuing to act in concert, as they did throughout their entire dealings with the property, could decide to cancel the options to the trusts and sell the property directly to Blomfield. Or, they could decide to go through the charade of causing the trusts to exercise the July 13, 1981, options and then cause the trusts to convey the property to Blomfield. Or, by mutual agreement, *496 they could have decided to cancel the options to the trusts and not sell the property at all. No one was in a position to object because the Fillers and Schlosberg were sole trustees and beneficiaries of their respective trusts. Indeed, Filler and Schlosberg, in apparent disregard of the exclusive options they had given the trusts only 5 days earlier, executed the nonexclusive July 18, 1981, option to ACRE at Tiffany's request. The price in this option [8] was the price at which the property was sold to Blomfield and Blomfield paid ACRE a commission for locating the surplus property. In our view, the July 13, 1981, cross-options were merely steps taken to use the trusts as conduits for the sale of the surplus property. Commissioner v. Court Holding Co.,324 U.S. at 334. *497 In the above-quoted words of Griffiths v. Helvering,308 U.S. 355, 358 (1939), petitioners used the trusts to retain "command" over the surplus property and its sales proceeds through "the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." The trusts were "equitable but controlled" interests and were "subservient agencies." In substance, petitioners sold the surplus property to Blomfield. [9]
Petitioners offer two reasons to support their contention that the cross-option arrangement had economic substance: (1) the options served to establish an agreed price for which each individual could cause the interest of the other to be purchased within a fixed period of time *498 and taken together were in the nature of a buy-sell agreement, and (2) the options served to restrict the ability of each individual to transfer his undivided interest in the surplus property to a third party "unwanted partner," either voluntarily or as a result of his untimely death. With all due respect to able counsel, we think these "reasons" are implausible rationalizations. As to the agreed price argument, we think it unreasonable to conclude petitioners used the clumsy cross-option arrangement for this purpose. The parties could have more easily prepared a simple agreement fixing the price and stating the circumstances in which the undivided one-half interests in the property would be sold. There would have been no reason to involve the trusts at all. Moreover, as petitioners themselves argue in support of their contention that $ 275,000 was a reasonable price in July 1981 for a one-half interest in the surplus property, it is generally recognized that an undivided one-half interest in property has less value than one-half of the value of the whole. Propstra v. United States,680 F.2d 1248 (9th Cir. 1982). The record discloses no convincing reason why *499 either the Fillers or Schlosberg would have agreed to sell their respective interests for a sum less than one-half of what the whole property would produce. Nor do we find the "unwanted partner" argument convincing. Assume, for example, Schlosberg found a purchaser of his interest and decided to sell it. If Filler did nothing, Schlosberg could sell his interest to the unwanted partner and allow Auke Bay Trust's option to expire. Filler would then have the unwanted partner. If Filler attempted to thwart the sale by causing Robino Trust to exercise its option, Schlosberg could then cause Auke Bay Trust to exercise its option and sell its share of the property to the unwanted partner. Filler's Robino Trust would then have the unwanted partner. We think the cross-options were granted to the trusts primarily, if not exclusively, for tax avoidance purposes. Although petitioners were free to arrange their sale of the surplus property in such way as to avoid, in whole or in part, a tax on their gain on the sale, the method they chose did not accomplish that objective. The substance of the transaction was a sale by petitioners rather than the trusts. [10]
*500 Section 6653(a)(1)[11] provides for the imposition of an addition to tax in the amount of 5-percent of the underpayment, if any part of the underpayment is due to negligence or intentional disregard of the revenue laws. Section 6653(a)(2) imposes an addition to tax in the amount of 50 percent of the section 6601 interest on that portion of the tax underpayment resulting from negligence or intentional disregard of the revenue laws. *501 The record shows that the cross-options arrangement was recommended to Schlosberg by Conahan, a tax attorney. Before entering into the transaction, the Fillers had their attorney review it. The Fillers' joint return was prepared by Gerry Keppler, a certified public accountant. Schlosberg's return was prepared by Ronald Griesen, also a certified public accountant. Both of these accountants, knowledgeable of the tax laws, testified they were fully informed of the facts and concluded that there was a reasonable basis for reporting the transactions as they did on petitioners' tax returns. Given these facts, we hold that the section 6653(a)(1) and (2) additions to tax are not applicable. "Reasonable reliance on the advice of an expert suffices to avoid the negligence penalty." Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976); Hill v. Commissioner,63 T.C. 225, 251-252 (1974), affd. per order (9th Cir., Feb. 22, 1977). To reflect the foregoing, An appropriate order will be issued in docket No. 37937-85. Decisions will *502 be entered under Rule 155 in docket Nos. 37943-85, 319-86, 320-86, 6417-86, and 6420-86.
Footnotes
1. The following cases are consolidated herewith: Miles S. Schlosberg and Beth A. Schlosberg, docket Nos. 37943-85 and 6417-86; Robino, Inc. Pension Trust, docket No. 319-86; Auke Bay Fish and Fruit Company Pension Trust, docket No. 320-86; and George Filler, docket No. 6420-86. ↩
2. In docket No. 37937-85, a joint motion to sever issue was granted on Sept. 26, 1986. Several issues remain in this case that will be dealt with at a later date. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
4. To finance the purchase price of $ 1,000,000 for Lot B and the renovation work on the theatre building, Robino, Inc. and Auke Bay entered into a partnership called Capital Office Park which obtained a $ 3,000,000 loan from Alaska Industrial Development Authority (AIDA). The loan was guaranteed by Robino, Inc., Auke Bay, the Fillers, and the Schlosbergs. ↩
5. Respondent also made alternative determinations which raise the issues numbered 3 and 4, above. In view of our disposition of issue 1, we do not reach those alternative determinations. ↩
6. As stated in the text, petitioners George and Evelyn Filler are the sole trustees and beneficiaries of Robino Trust. Petitioner Miles Schlosberg was the sole trustee and beneficiary of Auke Bay Trust. At common law, a trust involves the separation of legal and equitable interests. "Where a single individual has the whole legal interest and the whole beneficial interest, there is no trust. Where the sole trustee has also the whole beneficial interest, he simply holds the property free of trust." II Scott, The Law of Trusts, sec. 99, at 795 (3d ed. 1967); Morsman v. Commissioner,90 F.2d 18, 23-24 (8th Cir. 1937), affg. 33 B.T.A. 800 (1935). In Rev. Rul. 66-253, 1966-2 C.B. 122, the Commissioner ruled, however, that an owner-employee pension plan otherwise meeting the sec. 401 requirements will not be disqualified simply because the owner-employee is both the trustee and the only beneficiary of the trust if the plan is funded exclusively through non-transferable annuity or other insurance contracts. In IRS News Release IR-1651 (Aug. 3, 1976), the IRS announced that, based on the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829 (hereinafter ERISA), it "will not raise the issue of whether a trust will fail to qualify under section 401(a) merely because the sole trustee is the sole trust beneficiary. This applies to corporate type plans that do not include self-employed individuals as well as to plans that do, whether adopted before or after enactment of ERISA." Respondent has not here questioned the validity of Robino Pension Trust or Auke Bay Trust and, in fact, ruled that they were qualified under sec. 401↩. In analyzing the issues here presented, we accept the implicit concession that, even though there was no separation of legal and equitable interests, the trusts are valid ones for the purposes of the issues here presented. 7. In response to the interpretative difficulties created by the Commissioner v. Court Holding Co.,324 U.S. 331 (1945) and United States v. Cumberland Pub. Serv. Co.,338 U.S. 451↩ (1950), decisions, Congress enacted sec. 337, which, prior to its modification by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744, provided that no gain or loss is to be recognized on sales or exchanges of property which occur within 12 months after the adoption of a plan of complete liquidation, even if the sale is consummated by the corporation. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, pars. 11.64, 11.65, pp. 11-70, 11-77 (4th ed. 1979). The rationale of the two decisions, as shown by the cases discussed in the text, is relevant in a wide variety of substance versus form situations. 8. Petitioners assert the option to ACRE was not enforceable because the recited consideration was not actually paid, and Blomfield testified he did not know ACRE had obtained an option on the property. We think these arguments are beside the point. The significant considerations are that Filler and Schlosberg felt free to sign the option on July 18, 1981, only a few days after they had executed the exclusive options to the trusts. Moreover, regardless of its legality and some testimony to the contrary, the terms of this option to ACRE evidently fixed the price at which the property was ultimately sold to Blomfield. ↩
9. Petitioners cite Goodman v. Commissioner,74 T.C. 684↩ (1980), holding that a sale by two individuals to trusts of which they were trustees was a bona fide transaction. The case is distinguishable because the declarations of trusts in that case authorized such sales; the trustees were not also beneficiaries of the trusts, and the trusts were not subject to the prohibitions of ERISA. 10. Sec. 406 of ERISA (29 U.S.C. sec. 1106 (1976)) prohibits a "direct or indirect" "sale or exchange" between a retirement plan and a disqualified person such as its trustee in his individual capacity and, further, forbids a fiduciary from dealing with the assets of the plan in his own interest. This provision makes the prohibited transactions illegal per se. E.g., Donovan v. Cunningham,716 F.2d 1455, 1464-1465 (5th Cir. 1983). The facts discussed in the text, in our view, demonstrate that the cross-options arrangements were indirect transactions between petitioners and their respective trusts. Because the transactions were illegal under ERISA sec. 406, they could have been rescinded. II Scott, The Law of Trusts, sec. 170.12, pp. 1326-1330 (3d ed. 1967). Accordingly, the sale to Blomfield was not preceded by the kind of "genuine transaction" contemplated by the rule of United States v. Cumberland Pub. Serv. Co.,338 U.S. 451, 456 (1950). Generally speaking, the ERISA sec. 406 prohibitions are designed to protect against divided loyalties on the part of 453 U.S. 322, 334 (1981). In this case, because petitioners were both sole beneficiaries and sole trustees of their respective trusts, there is no evidence of divided loyalties. We do not think, however, that the sec. 401 recognition accorded trust arrangements which do not involve a separation of legal and beneficial interests (see n. 5, supra↩) was intended to render the ERISA sec. 406 prohibitions any less applicable. 11. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income, Gift, or Windfall Profit Taxes. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1) of any title B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax). ↩