T.C. Memo. 2006-25

UNITED STATES TAX COURT

ZALMAN MELNIK AND LEA MELNIK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MOSHE M. MELNIK, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 13392-01, 13395-01.     Filed February 15, 2006.

<u>George W. Connelly, Jr.</u>, and <u>Lawrence Sherlock</u>, for
petitioners.

<u>W. Lance Stodghill</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  In these consolidated cases, respondent
determined the following deficiencies and penalties in
petitioners' Federal income taxes:

Docket No. 13392-01
<u>Zalman Melnik and Lea Melnik</u>:

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a)[1] |
|------|------------|-------------------------------------------|
| 1997 | $731,083 | $146,217 |

Docket No. 13395-01
<u>Moshe M. Melnik</u>:

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|------|------------|----------------------------------------|
| 1997 | $1,015,157 | $203,031 |

The issues for decision[2] are:

(1)  Whether petitioners carried their burden of proving their sale of HouTex Metals Co. (HouTex) stock to Clend Investments Holding, Ltd. (Clend)--a foreign company owned by two Bermuda trusts established for petitioners' benefit--in exchange for private annuities, was not a sham transaction lacking economic substance;

---

[1]All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

[2]Respondent asserted a second alternative position in the notices of deficiency.  Respondent determined "that due to the transfer of appreciated stock of HouTex Metals, Inc., in 1996, a 35% excise tax is applicable on the value of the stock transferred reduced by the present value of the annuity received that is associated with this transfer for the 1996 taxable year in accordance with Internal Revenue Code Section 1491."  We do not have jurisdiction over the excise tax imposed by sec. 1491. <u>Freedman v. Commissioner</u>, 71 T.C. 564 (1979).

(2) whether, in the alternative, petitioners carried their burden of proving that the income from petitioners' respective trusts is not attributable to petitioners under the grantor trust rules; and

(3) whether petitioners are liable for the section 6662(a) accuracy-related penalties determined by respondent.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulated facts into our findings by this reference.

Background

Zalman Melnik and Lea Melnik (Lea) were married and resided in Houston, Texas, when they filed their petition. Moshe Melnik also resided in Houston, Texas, when he filed his petition. Hereinafter, we refer to these consolidated cases as this case.

Zalman and Moshe Melnik[3] (the Melniks) are brothers who grew up in Israel. In 1974, Moshe Melnik moved to Canada, where he attended college and received a degree in mechanical engineering. Moshe Melnik then worked in Canada as an engineer for a scrap metal company before moving to the United States in 1978 or 1979.

In 1979, Moshe Melnik and his wife at the time, Barbara Melnik, formed HouTex, a scrap metal dealer involved in the

---

[3]Petitioner Moshe Melnik is sometimes referred to as "Mike Melnik", and petitioner Zalman Melnik is sometimes referred to as "Sol Melnik" in the record in this case.

processing, recycling, and marketing of scrap metal.  Moshe and Barbara Melnik each received 5,000 shares of stock in HouTex and were the sole shareholders.

In 1980, Zalman Melnik, who had worked in the construction business in Israel, moved to the United States to help his brother set up the scrap metal business.  Zalman Melnik was responsible for the internal operations at HouTex, while Moshe Melnik was involved in the sales operation and customer solicitation.  In January 1981, Zalman Melnik received 7,000 shares of HouTex stock, and Moshe Melnik received an additional 3,000 shares.

In April 1996, Moshe and Barbara Melnik divorced.[4]  After a contentious battle over the valuation of their HouTex stock, Moshe and Barbara Melnik ultimately agreed that the fair market value of their 65-percent interest was $1,970,000.[5]  Moshe Melnik received Barbara Melnik's HouTex stock pursuant to their property settlement agreement.

After the divorce was final, Moshe Melnik sold some of his HouTex shares to Zalman Melnik.  Following the sale, Moshe Melnik

---

[4]During the divorce proceedings, Moshe Melnik's insurance agent advised him to set up a trust, but he did not do so at that time.

[5]The appraised value included a 20-percent discount for lack of marketability.

owned 58 percent and Zalman Melnik owned 42 percent of the 20,000 issued and outstanding HouTex shares.

HouTex Sale Negotiations and Annuity Agreement Discussions

During the 1980s, Moshe Melnik approached a company called Commercial Metals about the possibility of selling HouTex. Commercial Metals was not interested, however, in operating a scrap metal business.

In the 1990s, an individual named Larry White proposed a $2 million purchase price for HouTex. The Melniks rejected the proposal when they learned that a large portion of the purchase price would be paid in promissory notes.

After his 1996 divorce, Moshe Melnik again considered selling HouTex and getting out of the scrap metal business. Sometime in 1996, Moshe Melnik attended a scrap dealer convention in Las Vegas, where he heard about companies that were "rolling up" small scrap metal companies into larger, publicly traded companies. After the convention, on a date that does not appear in the record, Ben Jennings, the chairman of the board of directors and chief development officer for Metal Management, Inc. (MMI), contacted Moshe Melnik. MMI was engaged in the business of dismantling, processing, marketing, brokering, and recycling both ferrous and nonferrous metals. After preliminary discussions, on a date that does not appear in the record, Mr. Jennings came to Houston to evaluate HouTex, and initially he

proposed a purchase price in excess of $8 million, of which 90 percent would be paid in stock and the remaining 10 percent in cash.

Moshe Melnik, who was surprised at the amount of the MMI proposal, was interested in the proposal and sought legal advice regarding it from Larry Pennoni, an attorney whom he had met when Larry White had offered to purchase HouTex in the 1990s. Mr. Pennoni practiced in the areas of tax, international tax, and corporate mergers and acquisitions. Moshe Melnik and HouTex's accountant, Margie Reedy, met with Mr. Pennoni on a date that does not appear in the record to discuss the proposed sale of HouTex. Moshe Melnik wanted advice from Mr. Pennoni on the risks to himself and to Zalman Melnik if MMI acquired HouTex.

On dates that do not appear in the record, Mr. Pennoni met with the Melniks and discussed with them the risks of being sued by Barbara Melnik, whether the original HouTex valuation would be respected in such a suit, and how to prove that any offer to purchase HouTex was received after Moshe and Barbara Melnik's property settlement agreement. Mr. Pennoni outlined the tax aspects of a merger agreement and discussed with the Melniks various planning scenarios that might be used in connection with the sale of HouTex stock. The scenarios that Mr. Pennoni explained included setting up trusts for Moshe Melnik's children and gifting HouTex stock to them or putting the stock in a trust,

a foreign trust, a foreign corporation, or an Alaska trust.  Mr. Pennoni explained to Moshe Melnik the advantages and disadvantages of each scenario.

After Mr. Pennoni had reviewed the alternatives with the Melniks, the Melniks, on a date that does not appear in the record, chose a transaction in which they would sell part of their HouTex stock to a foreign corporation owned by foreign trusts in exchange for annuities.  The Melniks were concerned, however, that their money would not be secure in a foreign corporation owned by foreign trusts.  Mr. Pennoni had dealt with three trust companies in the past.  From those, he selected the Bermuda Trust Co. (Bermuda Trust), a subsidiary of the Bank of Bermuda, to set up the transaction.[6]

Mr. Pennoni also suggested that the Melniks obtain a second legal opinion about using foreign trusts.  He referred the Melniks to Carlos Kepke, an attorney who formerly practiced with Mr. Pennoni's firm and who also utilized foreign trusts in planning transactions.  Moshe Melnik testified that Mr. Kepke assured him that foreign trusts were safe and that the Melniks would receive their annuity payments.

_____

[6]To allay the Melniks' concerns about using foreign trusts, Mr. Pennoni introduced the Melniks at some point to David Richardson, a Bermuda Trust trust officer.

Formation of the Rashi and Rambam Trusts

On a date that does not appear in the record but was sometime before the sale of their HouTex stock, the Melniks decided to enter into the private annuity transaction that Mr. Pennoni had suggested. At the Melniks' request, Moshe Taub, an Israeli citizen, agreed to establish trusts for their benefit. Mr. Taub had served with Zalman Melnik in the Israeli Army and was an old and trusted friend of the Melniks.

On a date that does not appear in the record,[7] Mr. Taub executed two trust indentures, dated November 4, 1996, that established the Rashi and Rambam Trusts and appointed Bermuda Trust as trustee.[8] The initial corpus of each trust consisted of $10,000.[9] The trust indentures provided that Bermuda Trust had "sole and absolute discretion" to make distributions of any or all of the trust income or corpus to any one or more of the beneficiaries.

---

[7] The trust indentures are dated Nov. 4, 1996. However, in a letter to William Maycock, a Bermuda Trust trust manager, dated Oct. 14, 1996, Mr. Pennoni sent to Mr. Maycock trust indentures that had already been signed by Mr. Taub.

[8] Although the trust indentures are dated Nov. 4, 1996, Mr. Maycock signed the trust indentures on behalf of the trustee sometime between Nov. 20 and Nov. 22, 1996.

[9] On Oct. 8, 1996, Mr. Taub's bank in Israel issued two $10,000 checks to fund the Rashi and Rambam Trusts. On Oct. 14, 1996, Mr. Pennoni mailed the checks to Mr. Maycock. However, the checks were not credited to (and presumably not deposited into) trust accounts until Jan. 23, 1997, although Bermuda Trust, on Nov. 22, 1996, acknowledged receiving the checks.

The named beneficiaries of the Rashi Trust were:

[Mr. Taub], Zalman Melnik, the Descendants of any of the foregoing individuals, including, without limitation, [the names and ages of Mr. Melnik's children are omitted], the Spouses of any of the foregoing individuals, and any organization qualifying as a charitable organization according to the laws of Israel, Bermuda, or the United States of America.
* * *

Additionally, the Rashi Trust beneficiaries included, in general, any other trusts that exist for the benefit of the named beneficiaries. The Rambam Trust contained identical provisions naming its beneficiaries but, in place of Zalman Melnik and his children, substituted Moshe Melnik and his children. These beneficial interests were not fixed or definable interests with respect to all or any portion of the trusts.

The trust indentures appointed the Melniks to serve as trust protectors of their respective trusts. As trust protectors, the Melniks had the right to replace Bermuda Trust, with or without cause, with an independent corporate trustee. The successor trustee could not be a corporation in which a beneficiary (including Mr. Taub) or a trust protector held a direct or indirect economic interest greater than 1 percent.

In addition, the Melniks' respective trust indentures granted them "special testamentary limited powers of appointment" over the trusts. Pursuant to these powers of appointment, the Melniks were authorized to (1) direct outright all or any part of the income and/or principal to any person or to any entity or (2)

direct Bermuda Trust to retain and hold any amounts in a separate trust.  The Melniks' respective trust indentures further provided that when the Melniks die, subject to the terms of effectively exercised powers of appointment, Bermuda Trust must divide the remaining portions of their respective trusts into separate shares for the Melniks' children or their children's descendants.[10]

Acquisition of Clend by the Trusts and the Stock Purchase Agreements

As part of the overall transaction, Mr. Pennoni planned for the trusts to acquire a company with which the Melniks would exchange a portion of their HouTex stock for a deferred private annuity.  No earlier than in November 1996,[11] the Rashi and Rambam Trusts acquired Clend, a British Virgin Islands holding

---

[10]The sixth page of the Rashi Trust indenture as it appears in the record is incomplete.  The missing section contains the first few sentences directing the division of the remaining portion of the Rashi Trust after Zalman Melnik's death.  Though we can conclude from the seventh page of the trust indenture that Zalman Melnik's children or their descendants were to receive separate shares, we cannot conclude whether his spouse was also allocated a share.

[11]Again, the exact date does not appear in the record.  On Nov. 22, 1996, "Further to instructions received earlier today from Mr. Bob Colvin of Chamberlin Hrdlicka", Ethlyn George, a trust administrator at Arawak Trust, faxed a copy of inaugural minutes for Clend that appointed Mr. Maycock a director.  On Dec. 12, 1996, Ms. George faxed to Mr. Maycock a resolution of Clend's directors dated Nov. 7, 1996, that authorized him to sign the Nov. 8, 1996, stock purchase agreements.

company.[12] Clend had been incorporated by Arawak Trust Co. (Arawak) on March 3, 1995, and had conducted no business before it was acquired by the Rashi and Rambam Trusts. Clend's memorandum of association provided for authorized capital of 500 shares of $1 par value stock.

On a date that does not appear in the record,[13] Clend entered into separate stock purchase agreements[14] with Moshe Melnik and Zalman and Lea Melnik to purchase 75 percent of the outstanding shares in HouTex in exchange for private annuities. The stock purchase agreements provided that Clend's obligation to pay the annuities was an unconditional and unsecured personal liability and that the Melniks and Lea unconditionally waived all

---

[12]The record contains no exhibits confirming that the trusts purchased Clend or specifying how and when the acquisition occurred. However, by letter dated Dec. 5, 1996, Arawak Trust Co. forwarded copies of Clend's organizational documents to Mr. Colvin, an attorney in Mr. Pennoni's office.

[13]The stock purchase agreements do not show when they were executed. They show only the date on which they became effective.

[14]Mr. Pennoni had prepared the stock purchase agreements and determined the purchase price for the HouTex stock. Mr. Pennoni relied upon Mr. Colvin to calculate the annuity payments. Mr. Colvin consulted the Treasury regulations guidelines for computing the annuity payments and computed the annuity payments to be made under the annuity contract using approximately $6 million as the fair market value of 75 percent of the outstanding HouTex stock. The valuation of the HouTex stock appears to have been based on the acquisition price offered by MMI and not on the appraisals prepared in connection with Moshe Melnik's divorce case.

liens against Clend's property, including the HouTex stock.[15] The stock purchase agreements were signed by the Melniks and Lea and by William Maycock, a Bermuda Trust trust manager, as director of Clend[16] "to be effective as of" November 8, 1996. However, as of November 8, 1996, Clend had not yet held its first shareholders' or directors' meeting, had not yet appointed Mr. Maycock as a director, and had no assets to fund the purchase of the HouTex shares.[17] Clend did not participate in any negotiations regarding the terms of the stock purchase agreement, including any negotiations regarding the consideration to be paid for the HouTex stock it was allegedly purchasing.

On or about November 22, 1996, Clend held its first board of directors meeting. The minutes of that meeting purport to show that Mr. Maycock and Stanley Wright were appointed directors of Clend at that meeting.[18] The minutes also purport to show that,

_____

[15]Clend had no other assets when it entered into the stock purchase agreements with the Melniks and Lea.

[16]Although Mr. Maycock was not formally appointed a director of Clend until Nov. 22, 1996, or later in a resolution backdated to Nov. 7, 1996, Arawak authorized Mr. Maycock to sign the stock purchase agreements on behalf of Clend. That resolution was forwarded to Mr. Maycock on Dec. 12, 1996, so it is likely that Mr. Maycock was not authorized to sign and did not sign the resolution until on or after Dec. 12, 1996.

[17]It is also probable that, on Nov. 8, 1996, the Rashi and Rambam Trusts had not yet acquired Clend.

[18]The minutes of the first board of directors meeting at which Mr. Maycock and Mr. Wright were allegedly appointed
(continued...)

at that meeting, Clend issued 500 shares in bearer form, as follows:  210 shares, representing 42 percent of its outstanding shares, in the form of Share Certificate No. 1 and the remaining 290 shares, representing 58 percent of the outstanding shares, in the form of Share Certificate No. 2.  Moshe Melnik's trust was credited with 290 shares and Zalman Melnik's trust was credited with 210 shares of Clend's stock in the records maintained by Bermuda Trust.

Pursuant to the stock purchase agreement, on a date that does not appear in the record but which could not have been any earlier than November 22, 1996,[19] Moshe Melnik transferred 8,700 of his 11,600 HouTex shares to Clend in exchange for an annuity to commence on January 1, 2008, when he attained the age of 57, with quarterly payments of $226,401, payable until his death. The HouTex shares that Moshe Melnik transferred to Clend pursuant to the stock purchase agreement were valued at $3,480,000 for purposes of computing the annuity amount.

---

[18](...continued)
directors were apparently revised sometime after Dec. 12, 1996, "to give effect to the appointment to" Mr. Maycock and Mr. Wright.  However, the copy of minutes in the record does not indicate on its face that the minutes were revised on a later date.

[19]Mr. Pennoni delivered the stock purchase agreements and related stock certificates reflecting the sale of stock to Clend to Mr. Maycock by courier on Dec. 2, 1996.

Pursuant to the stock purchase agreement, on a date that does not appear in the record but which could not have been any earlier that November 22, 1996, Zalman Melnik transferred 6,300 of his 8,400 HouTex shares to Clend in exchange for an annuity to commence on January 1, 2006, when he attained the age of 57, with quarterly payments of $129,114, payable until the death of both Zalman and Lea Melnik. The HouTex shares that Zalman Melnik transferred to Clend were valued at $2,520,000 for purposes of computing the annuity amount.

After the Melniks transferred their HouTex stock to Clend, Moshe Melnik retained a 14.5-percent ownership interest in HouTex, and Zalman Melnik retained a 10.5-percent ownership interest in HouTex. After the transfer, Clend owned 15,000 of the 20,000 outstanding HouTex shares, representing a 75-percent ownership interest in HouTex.

HouTex Merger

Sometime during 1996, Moshe Melnik and Mr. Jennings of MMI negotiated the sale of HouTex. As a result of those negotiations, HouTex and MMI entered into a merger agreement, executed on December 10, 1996, and a first amendment to the merger agreement dated as of December 10, 1996. The agreement specified that the transaction would close before the end of 1996 unless the parties agreed to extend the closing to a later date. The merger was dependent upon MMI's ability to secure $37 million

in financing before April 30, 1997.  To effectuate the transaction, MMI organized MTLM Merger, Inc. (MTLM), as a wholly owned subsidiary and capitalized the subsidiary with MMI common stock.  MTLM was then to be merged into HouTex, with HouTex's being the surviving corporation.

On or about January 7, 1997,[20] the acquisition closed, and MMI paid the following consideration in cash, promissory notes, and unregistered MMI common stock and warrants in exchange for all the outstanding shares in HouTex:

| Shareholder | Cash | MMI stock | MMI warrants | Promissory notes |
|---|---|---|---|---|
| Moshe Melnik | $435,000 | [1]$168,381 | [2]$93,960 | $960,055 |
| Zalman Melnik | 315,000 | [3]121,930 | [4]68,040 | 695,213 |
| Clend | -0- | [5]1,058,690 | [6]108,000 | 5,000,000 |
| Total | 750,000 | 1,349,001 | 270,000 | 6,655,268 |

[1]59,289 shares of MMI at $2.84 per share
[2]87,000 MMI warrants at $1.08 per warrant
[3]42,933 shares of MMI at $2.84 per share
[4]63,000 MMI warrants at $1.08 per warrant
[5]372,778 shares of MMI at $2.84 per share
[6]100,000 MMI warrants at $1.08 per warrant

The total consideration that the HouTex shareholders received in exchange for their shares was $9,024,269.[21]  Individually, Clend,

_____

[20]The parties stipulated that the acquisition closed on Jan. 7, 1997.  However, various documents associated with the closing are dated Jan. 3, 1997.

[21]The values of the MMI shares and warrants that were used to report the transactions for Federal income tax reporting purposes were based on an appraisal by Howard Frazier Barker Elliott, Inc., as of Jan. 7, 1997.

Moshe Melnik, and Zalman Melnik received consideration totaling $6,166,690, $1,657,396, and $1,200,183, respectively.

On or about April 15, 1997, Clend exercised Category 2 conversion rights to acquire an additional 182,482 shares of MMI for $1 million.  The purchase price was offset against MMI's obligation to Clend under the promissory note.  On or about May 21, 1997, Clend exercised warrants to acquire 180,000 shares of MMI for $720,000.  The purchase price was again offset against MMI's obligation to Clend under the promissory note.  On or about June 3, 1997, MMI wired to Clend $3,388,907 representing the principal balance and interest due under the promissory note.  In June 1997,[22] MMI delivered the MMI warrants and stock to Clend.

Clend's Investments

On or about May 21, 1997,[23] the Melniks met Mr. Maycock for the first time at a meeting arranged and attended by Mr. Pennoni.  In a letter dated May 28, 1997, Mr. Maycock issued instructions

_____

[22]According to Clend's "Company Account Statement" for 1999, the Bank of Bermuda received 735,260 shares of MMI stock registered in nominee name (Gerlack & Co.) on or before Jan. 5, 1999.  On or before Jan. 15, 1999, the MMI shares were delivered to Warburg Dillon Read LLC, with offices in New York, N.Y.  From Aug. 18, 1999, through Oct. 1, 1999, Bermuda Trust sold or arranged the sale of 727,360 shares of Clend's MMI stock for approximately $930,000.

[23]In a letter dated May 28, 1997, which was a Wednesday, Mr. Maycock wrote to Mr. Pennoni acknowledging that he was introduced to the Melniks in Mr. Pennoni's offices on the preceding Wednesday.

regarding registering the MMI stock and wiring the proceeds from the payoff of Clend's promissory note.  In the May 28, 1997, letter, Mr. Maycock also explained that different investment proposals were being prepared for the approximately $3.4 million to be received in satisfaction of Clend's promissory note, and the proposals would be forwarded to Mr. Pennoni and the Melniks for their review.

By letter dated July 1, 1997, Mr. Maycock wrote to Mr. Pennoni to summarize certain discussions at a meeting which Moshe Melnik, Mr. Pennoni, and representatives of the Bank of Bermuda's investment department attended.  In that letter, Mr. Maycock stated as follows:[24]

> The meeting allowed Mike to learn of alternative strategies which could be adapted for the deployment of funds totalling initially US $3.4 million and for their diversification pursuant to the sale of some of the shares of Metal Management Inc. upon the removal of the holding restrictions in March of next year.  Based on the conclusions of that meeting it was agreed that three investment proposals would be prepared with different risk profiles i.e., ultra-conservative, conservative and moderate.  As you know, they were hand-delivered to Mike at the Princess Hotel prior to his departure.
>
> Once the proposals have been reviewed by him and his brother, Sol, may I suggest that he get into contact with Fern who now has responsibility for the administration of the affairs of Clend and the trusts.  She will in turn arrange with Joel for the funds to be

---

[24]References in the July 1, 1997, letter to "Mike" are to Moshe Melnik.  References to "Sol" are to Zalman Melnik.  References to "Fern" and to "Joel" are to Fern Inglefield and Joel Schaefer of the Bank of Bermuda's investment department.

deployed as required and at the same time arrange for our Bank's investment group to be appointed as the investment manager.

Copies of the three proposals are not in the record, and the record does not disclose what actions, if any, the Melniks and Mr. Pennoni took to review and comment upon the proposals.

In August 1999,[25] Moshe Melnik left MMI's board of directors and began pursuing ventures in real estate. Later that year, Moshe Melnik approached the Bank of Bermuda regarding an investment property in Houston. In response to the Bank of Bermuda's request for additional information on the property and its potential as an investment, Moshe Melnik sent maps of the area, as well as information regarding the owner, and explained that a rail system would be built next to the property. At some point,[26] Clend formed and capitalized a separate company, Tapuz, Ltd. (Tapuz), to acquire the property (the Tapuz property) for approximately $1.38 million.[27] The funds used by Clend to make the capital contribution were apparently advanced by the Bank of

---

[25]On Nov. 20, 2000, MMI and its affiliates filed for ch. 11 bankruptcy protection. However, over a period from Aug. 18 to Oct. 1, 1999, Clend had sold 727,360 shares of its MMI stock for approximately $930,000, so it is not clear from the record in this case how the bankruptcy impacted petitioners and Clend.

[26]From the account statements in the record, it appears that Clend capitalized Tapuz in approximately April 2000.

[27]The record does not contain any documentation regarding the acquisition of the Tapuz property, although petitioners testified that Tapuz purchased the property.

Bermuda, but the financing mechanism is not explained in the record.[28]  The Tapuz property was subsequently condemned, however, when the new rail line was rerouted through it.  At the time of trial, Tapuz allegedly still owned the property, which remained the subject of the condemnation proceeding.

Sometime during 1999, Moshe Melnik approached Bermuda Trust about appointing Goldman Sachs as an investment adviser for any U.S. investments.  Moshe Melnik had set up a personal cash management account at Goldman Sachs, and, when his adviser discovered that the Melniks had sold HouTex, his adviser suggested that Moshe Melnik invest the proceeds of the sale with Goldman Sachs.  Bermuda Trust informed Moshe Melnik that it could not appoint Goldman Sachs because Bermuda Trust had its own trading division, conducted its own deals, and did not let anyone else invest money for which it was responsible.  However, in 1997, Bermuda Trust had prepared three investment proposals

_____

[28]Clend transferred approximately $1.38 million to capitalize Tapuz.  The funds were apparently advanced by the Bank of Bermuda pursuant to a "credit facility" that is referenced but not explained in the record.  Clend's transfer of funds resulted in a deficit account balance in Clend's company account of approximately $888,500, as of May 3, 2000.  By Dec. 31, 2000, the deficit account balance in Clend's company account had cost Clend over $53,000 in overdraft charges and had increased to $1,284,523 as a result of the $900,000 in loans to the Melniks.  Sometime before Nov. 2, 2001, the Bank of Bermuda made a demand for Clend to repay its "credit facility" by Nov. 2, 2001.  When the requested repayment did not occur, the Bank of Bermuda liquidated investments in Clend's investment account to cover the deficit.  The investments were liquidated over a period from November 2001 to January 2002.

reflecting different levels of risk, had presented them to the Melniks, and apparently had permitted the Melniks to choose which proposal they preferred.

The $900,000 Loan From Clend to the Melniks

The Melniks investigated other potential real estate investments in Houston during 1999 and 2000. In 2000, they became involved with a Mr. Jacobs and with Mr. Jennings in an attempt to purchase a downtown Houston property for approximately $2.3 million. When Mr. Jacobs and Mr. Jennings were unable to secure financing for the transaction, they dropped out. Moshe Melnik attempted to obtain a loan from Whitney Bank in Houston, but Whitney Bank was only willing to lend him $750,000. Moshe Melnik then found two other partners and approached the Bank of Bermuda about purchasing the property. Instead of the Bank of Bermuda investing directly in the property, Bermuda Trust apparently agreed to have Clend make a loan. In approximately October 2000, Clend made two short-term loans to the Melniks totaling $900,000[29] bearing an interest rate of 8.22 percent in

---

[29]A "Summary of Financial Position (unaudited) As at December 31, 2001", and Clend's account records reflect that Clend made two loans of $450,000 each to Sol and Moshe Melnik on Oct. 27, 2000. According to the summary, the loans bore an interest rate of 10 percent per annum and were for a term of 5 years. However, the summary conflicts with the promissory notes in the record. The promissory notes are dated as of Oct. 27, 2000, and reflect 1-year term loans of $378,000 to Sol Melnik and of $522,000 to Moshe Melnik bearing an interest rate of 8.22 percent compounded annually. The promissory notes do not

(continued...)

exchange for promissory notes dated as of October 27, 2000. The promissory notes required the Melniks to repay the loans on or before October 27, 2001.

The Melniks did not meet the repayment deadline. In January 2002, Bermuda Trust contacted the Melniks to determine whether they anticipated repaying the $900,000 in loans or whether they wanted the loans to be treated as trust distributions. Bermuda Trust strongly recommended that if the Melniks could not repay the loans and interest in full immediately, they should obtain tax advice before proceeding. At the time of trial, the loans from Clend had not been repaid, canceled, or treated as distributions to petitioners.

As of December 31, 2001, Clend had the following assets: (1) The stock in Tapuz, which owned the Tapuz property, with a book value of $1,380,000, (2) $900,000 in promissory notes due from the Melniks, and (3) approximately $54,000 in cash.

Preparation of Petitioners' Tax Returns

In anticipation of filing their 1997 Federal income tax returns, the Melniks, on the recommendation of Mr. Pennoni, changed their accountant. Adrian Hernandez, a certified public accountant recommended by Mr. Pennoni, prepared the Melniks' 1997

---

[29](...continued)
indicate when the notes were executed or who prepared them.

income tax returns.  Mr. Hernandez relied upon information furnished by Mr. Pennoni regarding the sale of HouTex stock when preparing the Melniks' 1997 returns.

On his 1997 Federal income tax return, Moshe Melnik reported $1,608,515 as a long-term capital gain from the sale of his 2,900 shares of HouTex.  The sales proceeds reported by Moshe Melnik on his 1997 return were $29,000 less than the total consideration received.[30]

On their 1997 joint Federal income tax return, Zalman and Lea Melnik reported $1,179,183 as a long-term capital gain from the sale of Zalman Melnik's 2,100 shares of HouTex.  The sales proceeds reported were $21,000 less than the total consideration received.[31]

Respondent's Determinations

In notices of deficiency dated August 24, 2001, respondent determined that the Melniks' sale of their HouTex stock to Clend was a sham transaction lacking economic substance.  Pursuant to this theory, respondent determined that Zalman Melnik and Lea should recognize additional capital gain of $2,611,010, and Moshe

---

[30]The sale price that Moshe Melnik reported as a long-term capital gain on his 1997 return reflected a mathematical error in the amount of $19,881.  The mathematical error and the $29,000 underreporting of the total consideration received were taken into account in respondent's notice of deficiency.

[31]The $21,000 underreporting of the total consideration received was taken into account in respondent's notice of deficiency.

Melnik should recognize additional capital gain of $3,625,560.
In the alternative, respondent determined that petitioners'
"capital gains are increased because the * * * [Rashi and Rambam]
trusts which * * * [petitioners] state own the stock of * * *
[Clend] are grantor trusts whose income is taxable to * * *
[them] individually either as direct capital gains or Subpart F
income taxable as ordinary income."  Respondent also determined
that, with respect to either position, petitioners are liable for
section 6662(a) accuracy-related penalties.

OPINION

I.  The Private Annuity Transactions' Economic Substance

    A.  The Economic Substance Doctrine in General

    A taxpayer has the legal right to structure transactions in
a manner that minimizes or avoids taxes by any means the law
allows.  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  Even
so, if the "form employed for doing business or carrying out the
challenged tax event is unreal or a sham", the Government may
"disregard the effect of the fiction as best serves the purposes
of the tax statute."  Higgens v. Smith, 308 U.S. 473, 477 (1940).

    In Frank Lyon Co. v. United States, 435 U.S. 561, 583–584
(1978), the United States Supreme Court identified the
circumstances under which the the Commissioner must respect a
transaction for Federal tax purposes.  It stated that

        where * * * there is a genuine multiple-party
        transaction with economic substance which is compelled

or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.  * * *

After the Supreme Court issued its opinion in Frank Lyon Co., several Courts of Appeals reduced the Frank Lyon Co. formulation to a multipart test.  However, the Courts of Appeals do not agree whether the various parts are merely factors in deciding whether a transaction is a sham for tax purposes or are the exclusive elements for determining whether a transaction meets the Frank Lyon Co. formulation.  In Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), affg. in part, revg. in part and remanding 81 T.C. 184 (1983), the Court of Appeals for the Fourth Circuit held that Frank Lyon Co. requires the use of a two-part inquiry to ascertain whether a transaction has economic substance or is a sham that will not be recognized for tax purposes.  It articulated the inquiry as follows:

> To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists.  [Id.]

In contrast, in ACM Pship. v. Commissioner, 157 F.3d 231, 247 (3d Cir. 1998), affg. in part, revg. in part, dismissing in part and remanding T.C. Memo. 1997-115, the Court of Appeals for the Third

Circuit treated the business purpose and reasonable possibility of profit prongs as factors to be considered in determining whether a transaction is a sham for tax purposes, stating that

> these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a "rigid two-step analysis," but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.  * * * [Id.]

See also James v. Commissioner, 899 F.2d 905, 908-909 (10th Cir. 1990), affg. 87 T.C. 905 (1986).

This case is appealable, barring a stipulation to the contrary, to the Court of Appeals for the Fifth Circuit.  In Compaq Computer Corp. & Subs. v. Commissioner, 277 F.3d 778 (5th Cir. 2001), revg. 113 T.C. 214 (1999), the Court of Appeals declined to decide whether business purpose and the reasonable possibility of profit were the exclusive elements of a Frank Lyon Co. inquiry or simply factors to be considered in a Frank Lyon Co. inquiry, because it concluded that the transaction at issue there had both a realistic possibility of generating a profit and a business purpose.  Nevertheless, Compaq Computer Corp. confirms that the Frank Lyon Co. formulation is controlling.  A transaction will not be respected for Federal tax purposes if it lacks a business purpose and a reasonable possibility of generating a profit independent of tax considerations.

B.  The Parties' Contentions

Respondent contends that the formation of the Rashi and Rambam Trusts and the Melniks' subsequent transfer of their HouTex stock to Clend in exchange for private annuities lacked economic substance.  According to respondent, we should (1) disregard the annuity transactions as sham transactions lacking economic substance and treat the entire proceeds from the HouTex merger as petitioners' income or (2) recharacterize the private annuity transactions as transfers in trust with retained income interests.

Petitioners maintain that the trusts and Clend were not shams and that the private annuity transactions had economic substance.  Petitioners bear the burden of proof.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).[32]

C.  The Sufficiency of the Record in General

As the party with the burden of proof in this case, petitioners bear the ultimate burden of persuasion; i.e., the risk of nonpersuasion, as well as the initial burden of production.  See, e.g., Gerling Intl. Ins. Co. v. Commissioner, 86 T.C. 468, 476 n.5 (1986).  In order to satisfy their initial burden of production, petitioners were required to introduce evidence sufficient, if believed, to demonstrate by a

---

[32]In the stipulation of facts, petitioners conceded that sec. 7491(a) does not apply to shift the burden of proof to respondent.

preponderance of the evidence that respondent's determination is excessive; i.e., erroneous, and/or arbitrary; i.e., "without rational foundation". Helvering v. Taylor, 293 U.S. 507, 514-515 (1935); see also Pittman v. Commissioner, 100 F.3d 1308, 1317 (7th Cir. 1996), affg. T.C. Memo. 1995-243; Page v. Commissioner, 58 F.3d 1342, 1347-1348 (8th Cir. 1995), affg. T.C. Memo. 1993-398. If petitioners fail to satisfy their initial burden of production, the burden of production does not shift to respondent, petitioners do not satisfy their burden of persuasion, and we must uphold respondent's determination. Helvering v. Taylor, supra at 514-515; Berkery v. Commissioner, 91 T.C. 179, 186 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989).

Petitioners attempted to satisfy their initial burden of production and their ultimate burden of persuasion by calling only three witnesses--Zalman Melnik, Moshe Melnik, and Lawrence Pennoni. Zalman and Moshe Melnik are petitioners seeking to convince us that the annuity transactions at issue in this case should be respected for Federal income tax purposes. Mr. Pennoni is the attorney who planned and implemented the transactions. Petitioners did not call any witness to testify on behalf of MMI, the firm that acquired HouTex, regarding the timing and substance of the negotiations, nor did they call any witness to testify on behalf of Bermuda Trust, the Rashi and Rambam Trusts, or Clend.

The resulting record reeks of self-interest and is riddled with imprecision and inconsistencies that petitioners do not explain. The record fails to establish the dates when certain relevant events took place, is lacking in credible evidence that the annuity transactions had economic substance independent of tax considerations, and is woefully inadequate to demonstrate that respondent's determination was wrong.

The inadequacies permeate every aspect of the record. We shall review in detail some of the problems with the record presented by petitioners and our reasons for concluding that petitioners' evidence is not worthy of belief and is not sufficient to demonstrate that respondent's determination was in error.

### 1. Failure To Prove Relevant Dates

Petitioners contend that the establishment of the foreign trusts and Clend, the sale of HouTex stock to Clend in exchange for private annuities, and the sale and merger of HouTex were bona fide business transactions that were motivated by a business purpose and imbued with economic substance independent of tax considerations. However, the record fails to disclose the dates when important steps of these transactions took place, making it difficult, if not impossible, for us to evaluate the legitimacy of petitioners' contentions.

The record does not establish the following relevant dates:

a.  The dates on which Moshe Melnik met Mr. Jennings in Houston and received MMI's initial proposal to acquire HouTex;

b.  The date on which Moshe Melnik first met with Mr. Pennoni;

c.  The dates of subsequent meetings with Mr. Pennoni;

d.  The date on which the Melniks decided to engage in a transaction involving foreign trusts and a foreign corporation;

e.  The date on which the foreign trusts acquired Clend;

f.  The date on which the Melniks transferred their HouTex shares to Clend; and

g.  The date on which the Melniks and MMI reached an agreement in principle regarding the acquisition of HouTex.

Although the vagueness of the chronology in the record facilitates petitioners' arguments that MMI's acquisition of HouTex was negotiated over a period of months and was not finalized until after Clend had purchased 75 percent of HouTex's stock and that petitioners did not continue to exercise de facto control over the assets ostensibly owned by Clend and the foreign trusts, the lack of precise dates is a defect in the record that impairs our review of the transactions.  It is also a defect that petitioners could easily have remedied but did not.  It is well established that the failure of a party to introduce evidence which, if true, would be favorable to him, gives rise to the

presumption that the evidence would be unfavorable if produced. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

### 2. Backdating and "Effective As of" Dating of Documents

Petitioners have admitted that one of the critical documents in the record was backdated. Although petitioners explain the backdating as a matter of convenience, the fact that any backdating occurred suggests a willingness to manipulate the relevant chronology in a way that does not enhance the credibility of petitioners' evidence.

At least one document was revised after the effective date, but the fact of the revision is not disclosed on the face of the document. It also appears that several key documents were not prepared and dated contemporaneously. For example, the promissory notes dated as of October 27, 2000, that purported to formalize the loans the Melniks obtained from Clend were probably not executed on the dates indicated and conflict with records maintained by Bermuda Trust. Many of the critical documents reflect "effective as of" dating and do not reveal when they were executed.

The "effective as of" dating and backdating of relevant documents impede our review of the substance of the transactions involving the foreign trusts and Clend and lead us to conclude that the chronology reflected by those documents is not credible.

### 3. Suspicious Timing

The timing of certain actions raises questions regarding the accuracy of testimony given by the three witnesses in this case. Although each of the three witnesses claimed that the creation of the foreign entities and the sale of 75 percent of HouTex's stock to Clend was motivated by nontax business reasons, the timing of the creation of the foreign trusts, the acquisition of Clend, and the deposit of Mr. Taub's checks to fund the foreign trusts in relationship to the sale of HouTex stock to MMI casts doubt on that testimony. On October 8, 1996, Mr. Taub's bank in Israel issued two checks for $10,000 each to fund the foreign trusts. The two checks were mailed to Bermuda Trust on October 14, 1996, but were not credited to (or presumably deposited into) trust accounts until January 23, 1997. The deal with MMI apparently closed on or about January 7, 1997, because MMI transferred approximately $9 million in cash, warrants, and notes to or for the benefit of the Melniks and Clend at that time.[33] These facts permit an inference that Mr. Taub's checks intentionally were not deposited by Bermuda Trust until after the MMI deal had closed. That inference is not consistent with petitioners' argument that the formation of the foreign entities was separate from, and

---

[33]The MMI stock and warrants were placed in escrow at closing.

preceded, the negotiation and consummation of the private annuity and MMI transactions.

The proximity of certain key events, particularly in combination with petitioners' failure to prove the precise date of some of the events, is also telling. Petitioners did not introduce evidence to prove the exact date when the foreign trusts acquired Clend. Petitioners would have us believe that, sometime before November 8, 1996, the trusts had acquired Clend, had elected Mr. Maycock a director, and had authorized Mr. Maycock to execute the stock purchase agreements dated November 8, 1996, on behalf of Clend. As of November 8, 1996, however, Clend had not yet held its first directors' or shareholders' meetings (the first meeting of directors was not held until November 22, 1996), it had no director who was authorized to act on its behalf in executing the stock purchase agreements, and it had no assets with which to fund the purchase of the HouTex shares. Clend's shareholders, the foreign trusts, had not yet been funded and would not be funded until Mr. Taub's checks were deposited and credited to trust accounts on or about January 23, 1997.[34] The true chronology, incomplete though it is, suggests that documents were executed to create the misleading impression that the foreign entities were formed and functioning before the

[34]Until the checks were deposited and cashed, Mr. Taub could have stopped payment on the checks, thereby preventing the checks from being cashed and used to fund the trusts.

stock purchase agreements establishing the Melniks' right to private annuity payments were executed.[35]

### 4. Negotiations and Preparation of Documents

Petitioners admit that Clend did not participate in the negotiations with MMI. Only Moshe Melnik participated in the negotiations. Petitioners argue that Moshe Melnik represented the interests of all HouTex shareholders in the negotiations, but that claim rings hollow in the absence of any credible evidence in the record that representatives of Bermuda Trust authorized the representation, participated in the negotiations, or made any attempt to ascertain the value of the HouTex shares that Bermuda Trust allegedly held as a fiduciary.[36]

The record confirms that Mr. Pennoni prepared the relevant documents without any meaningful input from Bermuda Trust, and

---

[35]In fact, Moshe Melnik testified that the formation of the foreign trust was delayed until he knew he had a deal with MMI.

[36]In a letter to Mr. Pennoni dated Nov. 22, 1996, Mr. Maycock wrote as follows: "It was agreed in our telephone conversation that you would provide details relating to the planning purposes for the trust, information on the formation of the underlying BVI company, Clend Investment Holdings Ltd, to be put in place and the nature and value of the stock transaction to be conducted by and through that company." In a followup letter to Mr. Pennoni dated Dec. 2, 1996, Mr. Maycock stated the following: "Various details relating to the planning purposes of the trusts and for the underlying company were requested in that letter and I know (sic) look forward to receiving same together with the additional items to complete our compliance requirements." Mr. Maycock inserted a postscript indicating that "I have subsequently spoken to you concerning the planning tenets of the trust."

that a lawyer in Mr. Pennoni's firm calculated the value of the annuities under Mr. Pennoni's direction. And, although petitioners did not testify to this fact, the record supports a conclusion that the valuation of the HouTex stock and the amount of the annuity reflected in the stock purchase agreements prepared by Mr. Pennoni were based on the acquisition price to be paid by MMI for the HouTex stock.[37] In fact, the record supports a conclusion that the stock purchase agreements and related documents were prepared at a time when the approximate acquisition price of the HouTex stock that MMI would eventually pay was already known to Mr. Pennoni and to petitioners.

---

[37]Mr. Pennoni testified that he negotiated with Mr. Richardson regarding the amount that Clend agreed to pay under the annuity contracts in exchange for the HouTex stock and that Mr. Richardson was Clend's initial director. Mr. Pennoni also testified that the valuation of the HouTex stock was based on the two appraisals that were prepared in the divorce case. We do not accept this testimony as credible. The correspondence in the record establishes that Bermuda Trust had little involvement in structuring the annuity transactions, including the amount of the private annuities to be paid by Clend, and did not even receive any detailed explanation of the purpose of the foreign entities until approximately December 1996, after Clend had entered into the stock purchase agreements. The relevant documents do not contain any indication that Mr. Richardson negotiated any aspect of the annuity transactions or the MMI transaction. The relevant documents also do not support Mr. Pennoni's testimony that Mr. Richardson was Clend's initial director. The valuation of the HouTex stock for purposes of the annuity transactions appears to have been based on the acquisition price for HouTex proposed by MMI rather than the appraisals prepared for the divorce case.

## 5. Testimony Regarding Business Purpose

Each of the three witnesses testified regarding the alleged business purposes for the creation of the foreign entities and the sale of HouTex stock to Clend. According to the witnesses, the business purposes were to prevent Moshe's ex-wife, Barbara, from challenging the valuation of her HouTex stock in the divorce proceeding, to address the long-held concerns of Moshe and Zalman Melnik resulting from the fact that HouTex did not have a retirement plan, and to protect the proceeds of the HouTex stock sale from claims under warranties the Melniks would have to give to MMI.

The testimony regarding business purposes was not convincing or credible. The Melniks offered no evidence, other than their own self-serving testimony, that they had had any concern regarding their retirement before the MMI proposal was made. If their testimony were true, we would have expected to see evidence establishing that they had engaged in retirement planning in the past or that HouTex had investigated the possibility of establishing a retirement plan before the MMI proposal was made. No such evidence was offered, leading us to conclude that the Melniks' concern about retirement arose only when the Melniks were faced with the prospect of a substantial windfall resulting from the MMI proposal.

The testimony regarding Moshe Melnik's concern about possible litigation with his ex-wife also fails to convince us that the structure selected by the Melniks had a legitimate business purpose, independent of tax considerations. Even if the testimony were true, the testimony does not establish a business purpose for the use of foreign entities. At best, it indicates that Moshe Melnik had a personal reason for placing a portion of the proceeds in an entity that his ex-wife could not easily access, but such motivation hardly qualifies as a business purpose for the structure that the Melniks chose for the sale of their HouTex stock.

The other reason offered by the Melniks and Mr. Pennoni for the use of foreign entities is the concern about liability resulting from warranties given to MMI in connection with its acquisition of HouTex. We do not accept their testimony as credible. We do not believe that MMI would have entered into the transaction to acquire HouTex stock from a foreign entity if there had been any realistic chance that the warranties MMI had negotiated would be rendered unenforceable by the Melniks' use of the foreign entity. In fact, MMI stock and warrants to which the Melniks and Clend were entitled under the acquisition agreement were held in escrow after the HouTex acquisition closed to ensure that their contractual obligations to MMI were fulfilled.

The record regarding the business purpose for the use of the foreign entities is unsatisfying and unconvincing for the reasons summarized above. The record is also unconvincing and not credible because none of the witnesses ever admitted that tax considerations played any role in their decision to use the foreign entities. The tax savings that resulted from the use of the foreign entities were considerable, yet none of the witnesses acknowledged this reality when they attempted at trial to justify the use of the foreign entities. The only acknowledgment offered with respect to the tax consequences was in the form of testimony by Mr. Pennoni, who stated that taxes would eventually be paid by the Melniks when they received their respective annuity payments. The record, however, raises substantial questions regarding whether Clend will ever be in a position to pay the annuities in question. Assets that should have been invested and managed to ensure, to the fullest extent reasonably possible, that the annuities would actually be paid, were instead made available to the Melniks through loans and directed real estate investments that, as of the date of trial, were either in default or in litigation.[38]

---

[38]As of the trial date, the defaulted loans made to the Melniks had not been treated by Clend as distributions to the foreign trusts and by the trusts as distributions to the Melniks, even though Bermuda Trust had warned the Melniks that the unpaid loans might be treated as trust distributions.

6. Role of Clend

Neither the Melniks nor Mr. Pennoni offered any testimony regarding the business purpose for, or the role of, Clend, and the record fails to establish that Clend was acquired for reasons other than tax avoidance.

This Court has decided a number of cases involving foreign trusts and/or private annuity transactions involving foreign trusts. See, e.g., Weigl v. Commissioner, 84 T.C. 1192 (1985); Estate of Fabric v. Commissioner, 83 T.C. 932 (1984); Benson v. Commissioner, 80 T.C. 789 (1983); Stern v. Commissioner, 77 T.C. 614 (1981), revd. 747 F.2d 555, 558 (9th Cir. 1984); LaFarque v. Commissioner, 73 T.C. 40 (1979), affd. in part and revd. in part 689 F.2d 845 (9th Cir. 1982); Lazarus v. Commissioner, 58 T.C. 854, 864 (1972) (The principle of substance over form is "peculiarly applicable to annuities and trusts because they are easily susceptible of manipulation so as to create illusion."), affd. 513 F.2d 824 (9th Cir. 1975); Bixby v. Commissioner, 58 T.C. 757, 789 (1972); Archbishop Samuel Trust v. Commissioner, 36 T.C. 641 (1961), affd. sub nom. Samuel v. Commissioner, 306 F.2d 682 (1st Cir. 1962); Waegemann v. Commissioner, T.C. Memo. 1993-632. Except for Estate of Fabric v. Commissioner, supra, and Benson v. Commissioner, supra, in which we were required, under the rule of Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to follow adverse precedent

decided by the Court of Appeals for the Ninth Circuit, we have held in each of the enumerated cases either that the underlying transactions and/or entities lacked economic substance or were shams, that the private annuity transaction was really a transfer in trust with a retained income interest, or that the taxpayer was the grantor of the foreign trusts.

None of the above-cited cases involved an obligation to make annuity payments by a foreign corporation owned by foreign trusts. Interposing a foreign corporation between the annuitant and the foreign trust enabled petitioners to argue that the private annuity/foreign trust cases are distinguishable from the facts of this case and are not controlling.

The injection of Clend into the transaction planning in this case also enabled petitioners to argue that other Code sections designed to circumvent foreign entity tax planning do not apply. For example, section 679 provides that, subject to certain exceptions, a United States person[39] who directly or indirectly transfers property to a foreign trust shall be treated as the owner of the trust if there is a United States beneficiary of any portion of the trust. Because the Melniks transferred 75 percent of their HouTex stock to a foreign corporation and not to the

---

[39]Sec. 7701(a)(30) defines a U.S. person as a citizen or resident of the United States. The Melniks were U.S. persons within the meaning of sec. 7701(a)(30) and were beneficiaries of their respective foreign trusts.

foreign trusts, section 679 does not apply unless we conclude that the transfer to Clend was, in substance, an indirect transfer to the foreign trusts.[40]

Although respondent argues that section 679 allows us to conclude that Clend must be disregarded, we need not reach this issue. The record raises serious doubt regarding whether the foreign trusts had actually acquired Clend before Clend allegedly executed the stock purchase agreements with the Melniks. Moreover, the record suggests that, after Clend was acquired, it functioned primarily as a conduit in connection with the sale of the HouTex stock and the investment of the resulting proceeds.

In Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945), the Supreme Court of the United States held that the sale of an apartment building by a corporation's shareholders was, in substance, a sale by the corporation. The Supreme Court explained its holding as follows:

> The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of

---

[40]Sec. 1.679-3(f), Income Tax Regs., which applies to transfers after Aug. 7, 2000, see sec. 1.679-7, Income Tax Regs., provides that, if a U.S. person is a related person (such as a grantor or beneficiary) to a foreign trust, then any property transferred from the U.S. person to an entity in which the foreign trust holds an ownership interest is treated as a transfer by the U.S. person to the foreign trust followed by a transfer from the foreign trust to the entity owned by the foreign trust.

> negotiations to the consummation of the sale, is
> relevant. A sale by one person cannot be transformed
> for tax purposes into a sale by another by using the
> latter as a conduit through which to pass title. To
> permit the true nature of a transaction to be disguised
> by mere formalisms, which exist solely to alter tax
> liabilities, would seriously impair the effective
> administration of the tax policies of Congress. [Id.;
> fn. ref. omitted.]

See also Robino, Inc. Pension Trust v. Commissioner, 894 F.2d 342
(9th Cir. 1990) (holding that pension trust beneficiaries' sale
of real estate to their pension trusts, which immediately resold
the property, was in substance a sale by the beneficiaries),
affg. T.C. Memo. 1987-468.

Like the corporation in Court Holding Co., Clend functioned
as a conduit in the sale of HouTex. It did not participate in
the negotiations with MMI or in the valuation of the HouTex stock
it ostensibly owned. After the acquisition of HouTex by MMI,
Clend functioned primarily as the repository of the sale
proceeds, most of which were used to make loans to the Melniks or
to purchase real estate at the Melniks' request.

The lack of evidence regarding Clend's business purpose,
coupled with its apparent role as a conduit and its usefulness in
obfuscating the pertinent legal analysis, leads us to conclude
that respondent properly disregarded Clend in determining that
petitioners should be taxed on the gain from the sale of HouTex's
stock.

7.  <u>Petitioners' Relationship to Mr. Taub</u>

Moshe Melnik testified that Mr. Taub established and funded the foreign trusts because he is a close friend of the Melniks. Although Mr. Taub did not testify, we have no reason to doubt the truthfulness of Mr. Melnik's testimony regarding his friendship with Mr. Taub.  In response to the Court's question, however, Mr. Melnik also testified that Mr. Taub used $20,000 of his own money to set up the foreign trusts simply because Mr. Melnik asked him to do so and that Mr. Melnik did not offer or promise anything in return for Mr. Taub's generosity.  After reviewing the trust declarations, we have substantial doubt about the veracity of Mr. Melnik's testimony regarding the absence of a quid pro quo.

Each of the trust declarations contains a provision designating Mr. Taub a beneficiary of the trust.  Mr. Melnik did not mention this provision at trial or explain why Mr. Taub was a beneficiary of the Melniks' foreign trusts.  Absent an explanation, the beneficiary designations in the trust declarations cast doubt on Mr. Melnik's testimony.  Mr. Pennoni, who drafted the trust declarations, obviously anticipated that a distribution might be made to Mr. Taub at some point in the future, or he would not have included Mr. Taub as one of the trust beneficiaries.  Mr. Taub did not testify regarding any conversations that he may have had with the Melniks and Mr. Pennoni, and the witnesses who did testify failed to explain the

beneficiary designation.  Unexplained, the designation of Mr. Taub as a beneficiary of the foreign trusts raises the possibility that the money paid by Mr. Taub to establish the trusts could be repaid to Mr. Taub at a future date out of trust principal or income.

### 8.  Missing Documents

Relevant documents that might have helped to answer some of the questions left open by the record in this case were not introduced into evidence by petitioners.  Those documents included the three investment proposals regarding the Clend investment strategy, parts of Clend's account records including documentation of the "credit facility" provided by Bermuda Trust to Clend, and documents (including correspondence) relating to the negotiation and consummation of Tapuz's real estate transaction.

### 9.  Lack of Arm's-Length Dealings

In this case, the Melniks transferred 75 percent of HouTex's stock, worth millions of dollars, to an unknown and unfunded foreign entity without obtaining any security interest or guaranty whatsoever.  We must ask why.  The answer that we glean from the record is not favorable to petitioners.

Although the record in this case is not clear, it appears that the Melniks agreed to transfer their HouTex stock to a foreign corporation owned by foreign trusts without investigating

Bermuda Trust and the persons who would manage the foreign corporation.  Petitioners relied on the representations of Mr. Pennoni as their "due diligence" regarding the annuity transaction and did not require any security interest or guaranty in connection with the transfer of stock.

In the years following the sale of petitioners' and Clend's HouTex stock, the Melniks sought and obtained from Clend/Bermuda Trust at least two unsecured loans, totaling $900,000, to purchase real estate in the United States.  The Melniks defaulted on the loans, but no action had been taken by the Melniks or by Clend or Bermuda Trust to remedy the default as of the date of trial.  The Melniks also prevailed upon Bermuda Trust, the trustee of the foreign trusts and the entity in control of Clend, to arrange for Clend to form a subsidiary to purchase real estate that the Melniks wanted to acquire in the United States. Proceeds from the HouTex stock sale were used to make investments that were sold to cover the $1,380,000 purchase price.

As of December 31, 2001, Clend's assets consisted of the $900,000 loan receivable owed by the Melniks, the real estate acquired by Clend's subsidiary for $1,380,000, and approximately $54,000 in cash.  Of the total cash ($3,388,907) paid to Clend by MMI in 1997, $2,200,000 or 65 percent has been used to acquire real estate in the United States either at the Melniks' request or to enable the Melniks to purchase real estate directly.

Proceeds of $930,000 from the sale of MMI stock in 1999 were also dissipated. Some of the cash was used to pay substantial fees, and the remainder, with the exception of approximately $54,000, was apparently used to make investments primarily in U.S. stocks that were sold, often at a substantial loss, to cover the overage in Clend's account resulting from the $900,000 loans to the Melniks.

The record demonstrates that Clend functioned primarily as a conduit and that neither the Melniks, Clend, nor Bermuda Trust acted with the kind of restraint that one would expect to see from participants in a legitimate annuity transaction. Although Clend had a substantial annuity obligation to fund, Clend and Bermuda Trust used substantial portions of Clend's assets to make unsecured loans and high-risk real estate investments in the United States at the Melniks' request. In reality, the Melniks treated Clend's assets as a personal bank account and line of credit.[41] Such transactions support a conclusion that the Melniks had access to, and indirect control over, Clend's assets[42] in a manner that is inconsistent with the Melniks' paper status as creditors/annuitants.

_____

[41]During trial, Moshe Melnik referred to the assets held by his foreign trust and by Clend as "my money."

[42]In the Form 8-K that MMI filed with the Securities and Exchange Commission regarding the acquisition of HouTex, MMI stated that the Melniks indirectly controlled Clend.

In <u>Samuel v. Commissioner</u>, 306 F.2d at 687, the Court of Appeals for the First Circuit summarized the essential substance of a true annuity transaction as follows:

> Inherent in the concept of an annuity is a transfer of cash or property from one party to another in return for a promise to pay a specific periodic sum for a stipulated time interval. As such, an annuity contract gives rise to a debtor-creditor relationship between the transferee and transferor. * * * [O]nce the annuitant has transferred the cash or property to the obligor and has received his contractual right to periodic payments, he is unconcerned with the ultimate disposition of the property transferred once it is in the obligor's hands. * * *

In this case, the Melniks treated the stock sale proceeds that should have been invested to preserve and ensure Clend's ability to pay the annuities as a personal line of credit, which they used freely to finance real estate investments in the United States. They did not act like annuitants whose only claim was to periodic payments beginning sometime in the future. Although Bermuda Trust purported to be an independent trustee of the foreign trusts that owned and controlled Clend, the entity obligated to make the annuity payments, Bermuda Trust not only gave the Melniks virtually unlimited access to Clend's assets but failed to take action when the Melniks defaulted on the $900,000 loans.

All of the facts summarized above undermine the credibility of petitioners' case[43] and contribute to our conclusion that

---

[43]Petitioners argue that, because respondent did not call
(continued...)

petitioners' evidence in many material respects is not sufficient to satisfy either their initial burden of production or their ultimate burden of persuasion.  Because petitioners have failed to convince us that respondent's determination was erroneous, we sustain respondent's determination that the annuity transactions lacked economic substance.

Because we sustain respondent's determination, we need not and do not decide the alternative issues raised by respondent. We turn instead to respondent's contention that petitioners are liable for the accuracy-related penalty under section 6662.

II.  Petitioners' Liability for Section 6662 Penalty

Respondent contends that petitioners are liable for the accuracy-related penalty under section 6662 on alternate grounds: (1) The underpayment of tax was attributable to negligence or disregard of rules and regulations within the meaning of section 6662(b)(1), and (2) there was a substantial underpayment of income tax within the meaning of section 6662(b)(2).

---

[43](...continued)
any witnesses to dispute petitioners' version of the facts, we are required to accept petitioners' evidence without question. Petitioners are mistaken.  In order to satisfy their initial burden of production and their ultimate burden of persuasion, petitioners were required to produce evidence that was credible. If petitioners' evidence is not credible or if petitioners' evidence is not convincing enough to satisfy us that respondent's determination is erroneous, petitioners are not entitled to a decision in their favor.

Section 6662(a) authorizes a 20-percent penalty to be imposed on the portion of an underpayment of income tax attributable to negligence or disregard of rules or regulations. Sec. 6662(b)(1). Negligence "includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (stating that negligence is the lack of due care or failure to do what a reasonable person would do under the circumstances).

Section 6662(a) also authorizes the 20-percent penalty to be imposed if there is a substantial understatement of income tax. Sec. 6662(b)(2). A substantial understatement of income tax with respect to an individual taxpayer exists if, for any taxable year, the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000, whichever is greater. Sec. 6662(d)(1)(A).

Respondent bears the initial burden of production with respect to petitioners' liability for the section 6662 penalty, in that respondent must first produce sufficient evidence to establish that the imposition of the section 6662 penalty is appropriate. Sec. 7491(c). If respondent satisfies his initial burden of production, the burden of producing evidence to refute respondent's evidence and to establish that petitioners are not

liable for the section 6662 penalty shifts to petitioners.
Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

We have previously held that a taxpayer's adoption of a
"flagrant tax avoidance scheme" repeatedly rejected by the courts
is patently negligent.  Wesenberg v. Commissioner, 69 T.C. 1005,
1015 (1978); see also Gouveia v. Commissioner, T.C. Memo. 2004-
256; Hanson v. Commissioner, T.C. Memo. 1981-675, affd. 696 F.2d
1232 (9th Cir. 1983).  However, as petitioners point out, the
implementation of a private annuity transaction using foreign
entities has not been consistently rejected by the courts.
Although this Court has subjected such transactions to strict
scrutiny and has upheld only a few, the Court of Appeals for the
Ninth Circuit has reversed this Court in several cases involving
private annuity transactions, holding that, on the facts of those
cases, the transactions had sufficient economic substance to be
respected for Federal income tax purposes.  See Stern v.
Commissioner, 77 T.C. 614 (1981), revd. 747 F.2d 555, 558 (9th
Cir. 1984); LaFargue v. Commissioner, 73 T.C. 40 (1979), affd. in
part and revd. in part 689 F.2d 845 (9th Cir. 1982).

With this background in mind, we are unable to conclude that
a private annuity transaction using foreign entities is a
flagrant tax avoidance scheme that is per se negligent.  Instead,
we look to the evidence introduced by the parties to determine
whether petitioners are liable for the section 6662 penalty.

Petitioners contend that they were not negligent in using the private annuity transaction recommended and implemented by Mr. Pennoni. Petitioners also argue that, even if we conclude they were negligent, petitioners relied upon the advice of an experienced tax professional who had full knowledge of the relevant facts in entering into the private annuity transaction and that they qualify for relief from the penalty under section 6664(c).

Section 6664(c)(1) provides that "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The record consisted solely of a substantial number of stipulated exhibits and the testimony of three witnesses called by petitioners. The three witnesses testified, among other things, that the private annuity transactions were planned and implemented by Mr. Pennoni, who assured petitioners that the transactions were legitimate and were entitled to respect under Federal income tax law. The exhibits reflect the planning and implementation of the private annuity transactions and, on their faces, do not support a conclusion that petitioners' decision to enter into the transactions was per se negligent.

The uncontroverted record establishes that petitioners relied on Mr. Pennoni, who was the driving force behind the planning of the annuity transactions and who assured petitioners that there was a reasonable basis for the income tax reporting of the private annuity transactions and the HouTex stock sale.

We conclude that, under the circumstances, petitioners' reliance on Mr. Pennoni was reasonable, that petitioners had reasonable cause for the underpayment, and that petitioners acted in good faith with respect to the underpayment within the meaning of section 6664(c)(1).  Consequently, we hold that petitioners are not liable for the section 6662 accuracy-related penalty.

III.  Other Arguments

We have considered the remaining arguments of both parties for results contrary to those expressed herein, and we conclude that those arguments, to the extent not discussed above, are without merit or that it is not necessary to reach those arguments.

To reflect the foregoing,

Decisions will be entered under Rule 155.